**SO ORDERED**

**SIGNED this 16 day of September, 2026.**

**Pamela W. McAfee**
**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

**IN RE:**

**PATRICK ANTHONY TEDESCHI,**

**DEBTOR.**

**CASE NO.**
**24-03362-5-PWM**
**CHAPTER 7**

---

**STEVEN BAILEY and TABITHA BAILEY,**

**PLAINTIFFS,**

**v.**

**PATRICK ANTHONY TEDESCHI,**

**DEFENDANT.**

**ADV. PRO. NO.**
**25-00030-5-PWM**

## MEMORANDUM OPINION

The trial of this adversary proceeding to determine, pursuant to 11 U.S.C. § 523(a)(2)(A), the dischargeability of a debt owed by the defendant, Patrick Anthony Tedeschi, to the plaintiffs, Steven Bailey and Tabitha Bailey, was conducted on September 1, 2026 in Raleigh, North Carolina. At issue is whether the funds paid by the Baileys to Mr. Tedeschi and his company for furniture and other specialty household goods were obtained by Mr. Tedeschi by false pretenses, false representations, or actual fraud. For the reasons that follow, the court concludes that they were not, and the debt is not excepted from Mr. Tedeschi's chapter 7 discharge.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a statutorily core proceeding under 28 U.S.C. § 157(b)(1) that this court is authorized to hear and determine. The United States District Court for the Eastern District of North Carolina has referred this case and this proceeding to this court under 28 U.S.C. § 157(a) by its General Order of Reference entered on August 3, 1984. This proceeding is constitutionally core, and this court may enter final orders herein. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL HISTORY

Patrick Anthony Tedeschi filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on September 27, 2024. The Baileys filed the complaint in this adversary proceeding on January 29, 2025, contending, as set forth below, that they are owed a debt for money obtained by false pretenses, a false representation, or actual fraud that should be excepted from Mr. Tedeschi's discharge pursuant to 11 U.S.C. § 523(a)(2)(A).[1]

On April 21, 2025, the chapter 7 trustee advised that there were assets to administer and requested the clerk to send a notice to file claims. On July 25, 2025, the Baileys filed a proof of claim, Claim No. 15-1, asserting an unsecured claim in the amount of $171,000 for "money paid, fraud." The complaint in this adversary proceeding was attached to the proof of claim as the documentary evidence to support the claim. On August 7, 2025, the chapter 7 trustee filed a report

[1] The Baileys filed their complaint without the assistance of counsel, but they have been represented in the adversary proceeding since April 3, 2025. Mr. Tedeschi, on the other hand, was represented by counsel in his chapter 7 case and in this adversary proceeding until June 30, 2026, and has proceeded without representation since that date including for the trial of this matter.

of no distribution, indicating that there were no assets to be administered in the case. Mr. Tedeschi's discharge was entered on July 7, 2026, BR D.E. 54.[2]

The court conducted a final pretrial conference on August 26, 2026, in Raleigh, North Carolina, and entered the Final Pretrial Order on August 31, 2026, D.E. 81. The trial was conducted on September 1, 2026. On September 8, 2026, Mr. Tedeschi filed a motion to reopen the evidence and submitted a number of additional documents. *See* D.E. 84-89. Because the court has already determined that the Baileys failed to meet their burden of proof, the court denies the motion to reopen the evidence and has not reviewed or considered the additional documents.

**EVIDENCE PRESENTED AND FINDINGS OF FACT[3]**

Mr. Tedeschi and his business partner, Andrew Paul Greer, owned and operated an interior design firm called AG-PT Group, Inc. d/b/a AG Design (AG Design). In July 2019, the Baileys engaged AG Design to provide design services for their home in Virginia. Mrs. Bailey testified that the property was owned by Mr. Bailey prior to their marriage, and that they were conducting extensive remodeling to make the home "theirs." It was clear from the outset that this was a substantial project and that AG Design would be working exclusively with the Baileys during the project term.

AG Design presented the Baileys with a written proposal for the project, Ex. 2. The proposal, dated July 19, 2019, included design services for renovating and expanding the Baileys' 10,000 square foot home to include the addition of a living room, conservatory, and pool house,

[2] To the extent this opinion contains references to the docket in the underlying chapter 7 case, those references will be denominated as "BR D.E. --." Docket references within this adversary proceeding will be denominated simply as "D.E. --."

[3] This opinion sets forth the testimony and documentary evidence, much of which is undisputed. To the extent the evidence is conflicting, this recitation of the evidentiary presentation separately notes the court's findings of fact.

and renovations to the kitchen, entrance, master suite, master closet, upstairs bedrooms and baths, and downstairs game area. The proposal itemized the fees for services as follows:

| Description | Item | Quantity | Price |
|---|---|---|---|
| Design Fee | $8.00 | 10061 Sq. Ft. | $80,488.00 ✓ |
| Procurement (Variable/Optional based on clients needs) | $0.25 | 201220 total | |
| Project Management – Optional | $500.00 | 20 Week | |
| Travel Expense at $.54 per mile | $0.54 | 0 Mile | |
| Total Excluding Tax | $80,488.00 | | |

*Id.* at 13. An email exchange between the parties from July 20-22, 2019 revised the terms to provide for a 20% procurement fee rather than the customary 25%, and noted that line items that were "either variable or completely optional" were zeroed out to leave approximately $80,000 in fees "*over the next year* to cover the design deliverables, expenses, and our time." Ex. 3 (emphasis added). Mr. Greer also wrote that he "spoke with [Mr. Tedeschi] today regarding the project management phase (he typically leads that phase), and we are going to include that. Like we all discussed at some point, it does run smoother, the vision stands a much safer chance of not being compromised, and we want to [ensure] that everything is done as perfectly as possible for you guys." *Id.* The Baileys relied on the portion of the email exchange reducing the procurement fee as part of the contractual agreement at trial; accordingly, the court considers this and the other points in the email to the extent they further reflect the terms of the final agreement.

The Baileys testified that they did not agree to pay a project management fee because a general contractor was overseeing the entire project and the Baileys did not need an additional

project manager. Instead, they maintain, they agreed to a flat design fee of $8/square foot (the only item in the proposal that has a "checkmark" next to it), a fee of 20% of all items procured by AG Design calculated on vendor-discounted prices, and mileage to and from their Virginia property, which is located approximately 1:45 hours from AG Design's location in Raleigh, North Carolina. Mr. Tedeschi testified that Mr. Bailey expressed discomfort with the project management fee because it was variable, and that it was "zeroed out" on that basis; *i.e.*, to accommodate Mr. Bailey's preference to avoid a variable fee, but not because there would be *no* charge for time spent on the project. In other words, it was never Mr. Tedeschi's understanding that there would be no compensation beyond the flat design fee and the percentage procurement fee. He noted that although there is no "checkmark" next to the project management fee, there is also no "checkmark" next to mileage, which Mr. Bailey acknowledged that he agreed to pay. In short, the signed agreement does not reflect the entirety of the terms upon which the parties agreed, the signed agreement plus the email exchange likewise does not reflect the terms upon which the parties agreed, and there is no other written document that reflects the full agreement or any modification of the agreement for the initial term or for any term beyond twelve to eighteen months. It is apparent to the court and the court finds as a fact that there was no meeting of the minds related to the project management fee beyond what appears to be a waiver of a fee for project management for the first year.

The project started slowly. The agreement was signed in July 2019, but, early in the project planning, the Baileys decided to construct a pool house, and after some period of deliberation chose to build the pool house first so they could reside in it while the main house was renovated. The pool house project did not begin until November 2019. Although the Covid pandemic slowed things down, the pool house project was successfully completed and paid for, and the Baileys

moved into the pool house and started work on the main house. The timeline for the completion of the pool house and initial work on the main house is not clear to the court but the main house work was under way at least in mid-2023. During this time, the Baileys and Mr. Greer and Mr. Tedeschi became close friends, particularly Mrs. Bailey and Mr. Greer.

The testimony was consistent that the initial agreement contemplated a project of approximately eighteen months in duration; however, as the scope of work changed, the project continued for over five years. No new written contract was ever negotiated to reflect the changed scope or term. At some point in the project, Mr. Bailey scheduled weekly meetings at the property that required Mr. Tedeschi and Mr. Greer to travel between Raleigh and the Virginia property.

Mrs. Bailey testified that when work started on the main house, furniture was delivered to a warehouse for storage until various rooms in the house were ready to receive the furniture. At some time in 2023 or 2024, she came to believe that there was less furniture in the warehouse than she thought she had ordered, and when it was delivered to the house there were entire rooms of furniture missing. She also testified that she was being told that items were not “coming in” and “fabric was not available,” which could cause delays, but she still felt pressure to order furniture quickly because there was a sale price or a deal on shipping. Mrs. Bailey identified two specific incidents that underlie the Baileys’ claim: first, an issue with custom window treatments, and second, an unplaced furniture order.

The custom window treatments were to be fabricated and installed by Nina Zheler, a seamstress who works exclusively with interior designers. Ms. Zheler testified that she requires a 50% deposit at the placement of an order so that she may acquire materials, with the balance due at installation. Because of the scope of the project, it was divided into two or three phases. The first phase was for the master suite. Ms. Zheler received a deposit of $32,000 from AG Design.

Although there were delays in the installation, the window treatments were completed and installed over three days, and all but a small balance of $2,500 was paid by AG Design – the balance representing an amount that exceeded the initial, estimated quote based on actual costs.

Ms. Zheler testified that she never received a deposit for the second phase from AG Design; instead, Mr. Tedeschi gave her a check in the amount of $17,500 and asked her not to deposit it. According to Ms. Zheler, Mr. Tedeschi told her that he was delivering furniture to the Bailey house the next day, at which time he would obtain the funds from Mrs. Bailey to cover the deposit. Ms. Zheler testified that the next day, Mr. Tedeschi told her that the Baileys were not home, and to continue to hold the check. Ms. Zheler testified that she never received the deposit required to order the fabric for the second phase from AG Design. She also noted that Mr. Tedeschi talked to her about some of his and Mr. Greer's financial challenges, and that he had shared with her that he was trying to get a loan; Ms. Zheler thought the loan sounded "fishy."[4]

Ultimately, Ms. Zheler agreed to work directly with Mrs. Bailey to finish the project. The final cost exceeded the original estimate due to "added items." However, Ms. Zheler also disclosed her invoices to AG Design to Mrs. Bailey, at which time Mrs. Bailey became upset that AG Design charged her more for the window treatments than Ms. Zheler had invoiced AG Design. Ms. Zheler's testimony, however, was consistent in establishing that it is standard in the industry for designers to "mark up" costs, and that one of the reasons she generally does not work directly with the clients is the professional courtesy within the industry not to disclose or undercut a designer's specific markup. The court finds that if Mrs. Bailey had any expectation that AG Design would

[4] Based on the entirety of the evidence, the court understands the referenced loan to be a merchant cash advance loan.

simply be a "pass-through" of items and services procured at cost, that expectation was not reasonable or realistic.[5]

Mrs. Bailey testified that she paid $85,000 to AG Design for the window treatments, but then had to pay another $65,000 to Ms. Zheler for the fabrication and installation of the second phase. She did not clearly articulate the timing of these transactions. There was no documentary evidence presented to clarify what amounts were paid by Mrs. Bailey to AG Design for the window treatments and how those amounts align with what Ms. Zheler charged or received, or when.

With respect to furniture orders, Mrs. Bailey testified that she and Mr. Greer and Mr. Tedeschi went to the furniture market together, and that upon returning from the market there were incentives to ordering furniture quickly. She said that she believed the funds would be used to order the items identified at market, and that the payment was time sensitive to take advantage of market-related cost and shipping discounts. She specifically testified about a July 2023 invoice itemizing furniture for the sunroom and recliners for the bedroom and living room to be procured from a number of vendors totaling $163,097, Ex. 17. Mrs. Bailey paid the amount on the invoice, as evidenced by an entry in the bank account records of a deposit on July 25, 2023 in the amount of $163,097.05, *see* Ex. 4, but did not receive all of the items. As noted above, Ms. Bailey testified that she became concerned when the warehouse they were using to store furniture during the renovation seemed not to have the amount of furniture she ordered, and when "entire rooms" of furniture seemed to be missing. When she asked Mr. Tedeschi about this furniture, he admitted

[5] To the extent the Baileys understood that the procurement fee was to be applied to AG Design's discounted cost, as opposed to AG Design's charges with the benefit of the discount, that, too was unrealistic. Assuming that an interior designer has a 100% markup (which is purely an assumption for purposes of an easy example), a 100% markup of a discounted item results in the clients receiving the benefit of the discount, even if the clients are not paying the designer's cost. A procurement fee based on the amount charged to the client would similarly be based on the discounted cost, plus the markup. No business could operate as a pass-through at cost with only a marginal commission, which the Baileys' testimony suggested they expected.

that it had not been ordered. No clear timeline was identified, but it appears to the court based on documents surrounding the project that these discussions took place in the spring of 2024. There was no evidence that there was anything unusual about the manner in which the invoice was presented to Mrs. Bailey listing the items she wished to order, their prices, and the shipping/freight costs that would have to be paid to finalize the order.

Mr. Greer and Mr. Tedeschi also testified about this specific furniture order. Mr. Greer testified that he and Aaron (a person who was not fully identified at the trial but who appears to have worked with AG Design for a short time in 2023 or 2024) started to place the order and that Mr. Tedeschi stopped them. Mr. Greer testified that he understood the reason Mr. Tedeschi wanted to delay the order was a concern that Mrs. Bailey might change her mind, which made sense to Mr. Greer based on their history with the project. Mr. Tedeschi testified that he stopped them from placing the order for two reasons: one, that Aaron started using systems that AG Design had never used before – specifically, Google spreadsheets – and that Mr. Tedeschi did not believe orders would be properly tracked if they were on this different system; and two, that the funds were not available to pay for the order, partly because funds were being taken from the account by a merchant cash advance lender.

Although there was general testimony about "missing furniture," there was no further evidence of furniture or other items that were paid for and not delivered, with the exception of a cabana. Mrs. Bailey testified that AG Design quoted her $20,000 for a cabana. She said she thought that was too expensive and told Mr. Greer that she would wait and order it directly at a later date. According to Mrs. Bailey, Mr. Greer convinced her to order it through AG Design because it would "help the company," and offered to waive the procurement fee. Mrs. Bailey wrote AG Design a check for $14,000 but did not receive the cabana. Mr. Greer, on the other hand, testified that AG

Design accepted the money for the cabana even though it was not receiving a procurement fee, because they were ordering it as a favor to the Baileys. Mrs. Bailey testified that she later paid $12,000 to purchase it directly. Although the testimony is directly contradictory, there is no evidence that Mr. Tedeschi made any representation to Mrs. Bailey that induced her to pay AG Design for the cabana. The matter before the court is an allegation that Mr. Tedeschi obtained funds through his false representations, and the evidence does not support that allegation with respect to the cabana.

After the Baileys realized that the furniture reflected on Ex. 17 had not been ordered, Mrs. Bailey met with Mr. Tedeschi. He explained some of the financial struggles both he and Mr. Greer had experienced, and tried to find a solution. On July 10, 2024, Mr. Greer sent Mrs. Bailey an email, Ex. 22, that apologized for the errors, acknowledged that their small business should have engaged a bookkeeper to allow them to track expenditures, provided a spreadsheet of all purchases including what had been paid for, items that were canceled, discontinued, or not ordered, and proposed a way forward that could include a refund, but also suggested that the more practical resolution would be for the Baileys to move forward directly with A. Hoke, one of the suppliers, to proceed with the furniture already in process with that vendor. The Baileys rejected the proposals made by Mr. Greer and Mr. Tedeschi to resolve the matter, but did work directly with A. Hoke to order some of the selected items. Mrs. Bailey testified that she paid another $90-95,000 for that furniture.

Finally, as the issues with the furniture order came to light and the Baileys made clear that they wished to terminate the relationship with AG Design, Mr. Tedeschi and Mr. Greer generated a "final invoice," Ex. 23. Although the document presented to the court by the Baileys reflected only a final dollar amount showing nothing owed without a breakdown or explanation of the

figures, Mr. Tedeschi testified that he and Mr. Greer went through all of the documents to determine what amounts had been paid by the Baileys for items not received (which is included in Mr. Greer's email to the Baileys admitted as Ex. 22), then applied credits and offsets against what Mr. Tedeschi calculated to be amounts owed to AG Design for work performed (which is detailed in Ex. H). At the end of the day, Mr. Tedeschi maintained that the Baileys still owed AG Design a balance of approximately $10,000, and AG Design waived that amount as a courtesy. The Baileys, on the other hand, characterized the final invoice as "fraudulent."

Bank statements and credit card summaries were also presented. At the trial, bank statements for 2023 and 2024 were examined to demonstrate a number of cash transactions, transfers to Mr. Tedeschi and Mr. Greer individually, and personal bills including credit cards paid by AG Design. Mr. Tedeschi was unable to testify as to the specifics of the transactions but acknowledged that there were many personal expenses paid from the account, noting that neither Mr. Tedeschi nor Mr. Greer was paid a salary. Similarly, a credit card summary for a credit card held by Mr. Tedeschi's father, on which Mr. Tedeschi was an authorized user, showed numerous personal charges that ultimately were paid by AG Design, as well as significant charges for what appears to be the Baileys' furnishings. There appear to be other bank accounts and credit cards that were not offered into evidence, leaving the court without a complete picture of the finances of either AG Design or Mr. Tedeschi. However, the documents that are in evidence show that from 2022 through the petition date, both business and personal expenses were paid from the AG Design bank account and charged to Mr. Tedeschi's father's credit card.

The Baileys suggested that Mr. Tedeschi used their funds to take lavish vacations and obtain luxury items, but the evidence was that Mr. Tedeschi's spouse moved to Mexico, and Mr. Tedeschi visited him there approximately twelve times during the five-year project. There was no

evidence of any particularly lavish expense but, as noted above, there was no real evidence of what any of the funds were used for, only that funds were transferred to Mr. Tedeschi and Mr. Greer or to pay the credit card bill. As noted below, many of the charges on the credit card were demonstrably business expenses, so a payment from AG Design's bank account to the credit card is not necessarily evidence of the business paying personal expenses.

Mr. Tedeschi testified that working for only the bottom-of-the-market $8/square foot design fee and the reduced 20% procurement fee, for five years, with the Baileys as their only client was unsustainable financially. His effort to generate a final invoice showing the hours spent on the project reflected 5-10 hours of "extra" work each week that was never intended to be uncompensated. Mr. Tedeschi presented a document that itemized his calculations for the "final invoice," which included an $8/square foot fee for the total square footage of the house at 14,061,[6] totaling $112,488; mileage between Raleigh and the Baileys' home in Virginia for meetings from 2019 through June 2024[7] with a total value of $24,026.03; and a weekly project fee totaling $79,000 based on $500 per week from March 2021 to June 1, 2024, noting that the fee had been waived for the first 18 months of the project consistent with Mr. Greer's email to Mr. Bailey at the contract's inception. *See* Ex. H. The final invoice credited the Baileys with the $40,000 deposit paid in July 2019, identified a balance of $175,514.03 against which AG Design offset the amount of $161,742.26 for undelivered furniture, and waived the approximately $10,000 difference, resulting in the document offered into evidence by the Baileys showing a zero balance, Ex. 23.

[6] There was some disagreement about whether the "extra 4,000 square feet" was the pool house, for which AG Design had been paid, or the design for the basement of the main house, which Mr. Tedeschi contends was designed even though they did not proceed with the renovation, and which Mrs. Bailey says they did not do. The court need not reach a decision on which of these is correct, as the answer is not essential to this decision.

[7] Specifically, he listed 23 meetings in 2019-2020 at $0.54 per mile; 26 meetings in 2021 at $0.56 per mile; 91 meetings in 2022 at $0.63 per mile; 74 meetings in 2023 at $0.66 per mile; and 24 meetings in 2024 at $0.67 per mile.

Mr. Tedeschi testified that he was surprised that the Baileys did not expect to pay for his and Mr. Greer's time. He denied any intent to defraud the Baileys, instead describing the entire project as an "endeavor of love" that he was surprised they were unable to fix.

Mr. Greer testified that once the weekly meetings began, he and Mr. Tedeschi spent Tuesdays preparing for the meetings, Wednesdays driving to and attending the meetings, and Thursdays implementing the items discussed at the meetings. For most of the project, AG Design had no additional staff beyond Mr. Greer and Mr. Tedeschi. Mr. Greer's testimony was consistent with that of Mr. Tedeschi: they worked having received only the $40,000 deposit, and the 20% procurement fee was not enough to compensate them for the work they were doing. Had he known the scope that the project would eventually encompass, he testified, AG Design might not have taken the job because it required more resources than they had, encompassed all of their time, and prevented them from taking on additional clients. Mr. Greer testified that he used his trust funds to sustain the business (a fact supported by his July 2024 email to the Baileys, Ex. 22), and that the project was "always almost finished" to the point that he repeatedly thought they could "last a little longer," which ultimately would counterbalance some of the rising costs and burdens in that they could use the project to establish new clients and a new stream of income.

Significantly, both Mr. Tedeschi and Mr. Greer testified that they expected to be able to use photos from the Bailey project – which was projected to be, and by all accounts was, a showpiece – for marketing purposes to develop future business at the completion of the project, and that having that opportunity was a key component to doing the job on reduced fees. Because of the deterioration of the relationship, that did not happen.

Mr. Greer also testified that he did not believe at the time that Mr. Tedeschi was misleading the Baileys or that he was acting fraudulently or inappropriately, and that he still has seen nothing to change that view.

**DISCUSSION AND CONCLUSIONS OF LAW**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from the debtor's discharge liability for any debt: "(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." The burden of proof is on the plaintiffs, who must establish each element by the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

**False Pretenses**

The elements necessary to establish false pretenses under § 523(a)(2) are (1) a fraudulent misrepresentation; (2) that induced the plaintiff to act or refrain from acting; (3) that caused harm to the plaintiff; and (4) upon which the plaintiff justifiably relied. *See Andresen & Arronte, PLLC v. Hill (In re Hill)*, 425 B.R. 766, 775 (Bankr. W.D.N.C. 2010) (citing *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 134 (4th Cir. 1999)). The first element, fraudulent misrepresentation, is satisfied "if the debtor's representation was known to be false or recklessly made without knowing whether it was true or false." *Hill*, 425 B.R. at 775 (citing *Boyuka v. White* (*In re White*), 128 Fed. Appx. 994, 998 (4th Cir. 2005) (unpublished opinion) (citing *In re Woolley*, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991))). "And, a debtor's misstatement of intention is only 'fraudulent if he does not have that intention at the time he makes the representation.'" *Id.* (citing *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir. 1997) (quoting Restatement (Second) of Torts § 530(1) (1976))).

> However, "a promise or declaration, standing alone, is insufficient to support a claim under § 523(a)(2)(A), because a promise to perform some act in the future, without more, does not constitute a representation for purposes of § 523(a)(2)(A)." *Riddle Farm Equi. v. Boles (In re Boles)*, Ad. Pro. No. 04–6027, 2005 WL 1288106 (Bankr. M.D.N.C. 2005) (unpublished) (citing *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir. 1992)) ("[A] promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached.") Finally, a breach of contract, even an intentional breach, is not a fraud as contemplated by § 523(a)(2)(A). *See Strum v. Exxon Co.,* 15 F.3d 327, 331 (4th Cir. 1994).

*Id.*

The court finds that the elements necessary to support a § 523(a) claim were not established. First, it is not clear to the court that Mr. Tedeschi made any affirmative representation to the Baileys that "induced" their payments. The Baileys did not identify a particular statement made by Mr. Tedeschi, but instead said they felt general "pressure" to make the payment needed to place orders to take advantage of discounts. The written invoice is simply a list of items, the price per unit, and the additional costs required to fulfill an order: taxes and freight. *See* Ex. 17. There is no email accompanying the invoice, and there is no evidence of a contemporaneous phone call or similar communication expressing urgency. Significantly, there is no evidence that this transaction differed from any other during the prior four years of the project. The testimony established that time-limited discounts on merchandise and shipping are standard components of the home goods and design industries. Because there is no evidence of a specific misrepresentation, the court cannot find that the Baileys met their burden of proof to establish false pretenses.

Notwithstanding the absence of any identifiable representation by Mr. Tedeschi, the court also finds that any statements that may have been made by Mr. Tedeschi with respect to the payments for furniture, window treatments, and other items that AG Design was to procure for the Baileys do not qualify as misrepresentations because there is simply no evidence that Mr. Tedeschi did not intend to purchase the items at the time the payments were requested and made. Again,

there is no evidence that this transaction differed from any other during the prior four years, until the items were not actually ordered and paid for. The fact that AG Design had for the duration of the relationship always invoiced items in precisely the same manner and ordered and delivered the furniture, while also paying personal expenses out of the business bank account, strongly suggests that there was no intent not to order the items paid for in July 2023 in the same way as they always had. In short, the court is not persuaded that after a multi-year relationship, Mr. Tedeschi decided to solicit funds from the Baileys with the intent to abscond with them. Accordingly, the court finds that the plaintiffs have not met their burden of proof to establish that the debt was obtained by false pretenses.

**Actual Fraud**

The elements necessary to establish actual fraud under § 523(a)(2) are (1) that the debtor made a representation; (2) that the debtor knew the representation was false at the time it was made; (3) that the debtor intended to deceive the creditor; (4) that the creditor relied on the representation; and (5) that the creditor sustained a loss as a result of that reliance. *Hill*, 425 B.R. at 766; *see also Winston-Salem City Employees' Federal Credit Union v. Casper (In re Casper),* 466 B.R. 786, 793 (Bankr. M.D.N.C. 2012); *Randle v. Highfill (In re Highfill),* 336 B.R. 701, 706 (Bankr. M.D.N.C. 2006). As noted by *Hill*,

> The intent requirement for actual fraud parallels the knowledge requirement for misrepresentation- "A false representation made under circumstances where [the maker] should have known of the falsity is one made with reckless disregard for the truth." *See Medlock v. Meahyen* (*In re Meahyen*), 422 B.R. 192, 202 (Bankr. D. Minn. 2010) (citing *The Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785 (8th Cir. BAP 1999)). Further, the Restatement (Second) of Torts states, "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of the representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." *Id.* (citing Rest. (2d) Torts § 526 (1977)).

*Hill*, 425 B.R. at 766.

As stated above, the court finds that to the extent any actual representation was made, which is not apparent to the court, there is no evidence that Mr. Tedeschi did not believe or know that AG Design would not order and pay for the items to be procured on behalf of the Baileys. Even if Mr. Tedeschi knew that *some* of the funds would be used for other things, there is no evidence that Mr. Tedeschi knew that *none* of the funds would be used as intended. Indeed, although there were certainly other, personal expenses being paid from the business bank account, there were also transactions that were clearly business expenses including furniture, wallpaper, fabric, and other interior-design related payments throughout the bank statements provided as Ex. 4 and the credit card summaries provided as Ex. 8, including approximately $30,000 to A. Hoke, one of the suppliers of the furniture in question, in August 2023 – just weeks after the Baileys made the payment to AG Design based on the invoice in question. Based on the evidence presented to it, the court finds that Mr. Tedeschi did not make any representation that he knew was false, and the plaintiffs have not met their burden of proof to establish that the debt was obtained by actual fraud.

**Further Analysis of the Evidence**

Having found that there was no fraudulent misrepresentation or actual fraud, the court need not go further, but in the interest of thoroughness and in hopes of bringing some sense of closure to the parties, the court will briefly address the other "red flags" identified by the Baileys to explain why they do not change the result. The Baileys contend that the fact that personal expenses were paid from the business account demonstrates an intent to misappropriate the Baileys' funds. However, the documentary evidence is clear that Mr. Greer and Mr. Tedeschi *always* paid their personal expenses from the business account, at least as far back as the 2022 bank statements provided to the court at Ex. 4, in lieu of receiving a salary. They had no other source of income for

the entirety of the relationship. That did not change upon receipt of the $163,000 furniture payment from the Baileys, and there was no evidence of any dramatic increase in the amount of expenses paid in that timeframe from any time in the past. And although paying personal expenses from the business account and paying business expenses with a personal credit card demonstrate an unfortunate failure to maintain corporate formalities, they do not lead to a finding of fraud.[8]

The Baileys also contended that Mr. Tedeschi was using their funds to maintain an extravagant lifestyle including numerous trips to Mexico and a Gucci belt.[9] As noted, Mr. Tedeschi's spouse moved to Mexico during the time he was working on the Bailey project, and twelve trips to see one's spouse over five years is not extravagant. There was no evidence of Mr. Tedeschi using the Baileys' funds to pay for expensive flights or high-end resorts. There was no evidence of luxurious items purchased at all, much less in a questionable manner. Mr. Tedeschi testified that after his spouse moved to Mexico, he moved in with Mr. Greer, which also is inconsistent with the kind of reckless and profligate spending that may occur when an individual is spending money that is not theirs to spend. The evidence demonstrated a lack of attention to the books, but not overspending or a luxurious lifestyle that would support a finding of intent to 'steal' the Baileys' money.

Mr. Tedeschi also testified that one reason the funds were not available to pay for the items at the time they were to be ordered was that AG Design had taken out a business loan from a merchant cash advance (MCA) lender, and the MCA lender was drafting funds from the bank account. The bank records from April 2024 show a cash infusion followed by funds being drafted

[8] Indeed, absent a finding of fraud, there is no basis upon which Mr. Tedeschi could be personally liable for the amounts owed by AG Design to the Baileys unless the "corporate veil" is pierced – a claim that was not raised, and, if it had been, would still have only established a dischargeable breach of contract claim.

[9] There was no evidence about a Gucci belt, or any other luxury item, other than Mrs. Bailey's offhand remark that she knew he had one.

by an MCA lender on a daily basis, but it is not clear from the evidence before the court whether there was an earlier MCA advance, nor can the court identify the source of deposits to the account during 2022-2024 other than the few traceable to the Baileys. Accordingly, while the court credits Mr. Tedeschi's testimony regarding the additional constraints the MCA loan put on the business, it cannot conclude that an MCA loan is the only reason, or a specific reason, that the funds were not available to pay for the furniture in the July-September 2023 timeframe. The evidence was less than clear about the timing of any of the events in question, including whether the MCA loan may have impacted the second window treatment transaction, except the date on which the Baileys paid the $163,000 to AG Design, July 25, 2023. Written communications about the problem and how to resolve it did not occur until roughly June 2024.

Ultimately, the court found Mr. Tedeschi to be credible. "Issues of intent and reliance are factual determinations and . . . '[i]t is highly unlikely that a situation would ever arise under which summary judgment would be appropriate in [an] adversary proceeding brought under section 523(a)(2).'" *Lexington State Bank v. Coles (In re Coles)*, No. 02-52908, 2003 WL 22399721, at *3 (Bankr. M.D.N.C. Oct. 14, 2003) (quoting *United States v. Earhart (In re Earhart)*, 68 B.R. 14, 17 (Bankr. N.D. Iowa 1986)). This is so because findings of intent largely turn on credibility and the demeanor of a party on the witness stand. Here, the court is persuaded that Mr. Tedeschi had no intent to deceive the Baileys at any time, and no intent not to order the furniture in the usual way at the time the funds were paid. The reality of any business is that some funds are used to operate, including to pay employees for their services. For these parties, as finances became complicated, things clearly did not go as planned, with unfortunate results for all involved. Having heard the testimony and reviewed all evidence of record, the court is sympathetic to the Baileys' frustration and understands their distress at the design project not concluding as they planned.

Although the parties certainly were engaged in a contract dispute, there is no evidence of an affirmative intent on the part of Mr. Tedeschi to induce the Baileys to pay funds that would be redirected to his benefit.

The last invoice does not persuade the court otherwise. Although the Baileys characterized the invoice as "fraudulent," the court views it as an effort to document the financial reality that AG Design found itself in at the end of a relationship that had deteriorated past the point of saving, well after it surpassed its initial scope. Whether AG Design could contractually recover all of the project management fees it asserted as charges and offsets in that document is not before the court, but the other amounts were largely agreed to by the Baileys and apparently never paid.

Finally, and as noted previously, there was no specific evidence that anyone from AG Design represented to the Baileys that the Baileys' funds would be directly and specifically used to pay for their furniture orders. The testimony made clear to the court that the Baileys assumed that the exact funds from their payment would be used to order their furniture, and while that assumption is reasonable on the surface, it is inconsistent with the general treatment of deposits in the context of consumer goods, including in this case. That understanding – or, rather, misunderstanding – is precisely the issue Congress addressed when it gave priority to consumer deposits for undelivered purchases where those deposits would otherwise be general unsecured claims. As described in *In re P.J. Nee Co.*, 36 B.R. 609, 611 (Bankr. D. Md. 1983):

> The priority of § 507(a)(5) was established for the first time in the 1978 Code. As described in King, *Collier on Bankruptcy,* 15th ed., ¶ 507.04 [5], the priority reflected the solicitude of Congress for the problems encountered by consumers who made deposits with retailers that later became bankrupt. As the House Judiciary Report noted:
>
>> A consumer that pays money on a lay-away plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or a gym membership, is a general unsecured creditor of the business to which he has given his money. Very few consumers are aware of their status as

> general unsecured creditors. If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag. Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors. Because of his ignorance and his inability to bargain with a retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. A recent example is the W.T. Grant bankruptcy. All customers who held "Grant's script" have essentially lost their deposits.

H.R. Rep. No. 595, 95th Cong. 1st Sess. at 188 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6148–49. Clearly the intention of Congress was to protect the individual creditor who was unable to protect himself and who was the last to receive the news of an impending insolvency.

*P.J. Nee Co.*, 36 B.R. 609 at 611. The court in *In re Util. Craft, Inc.*, No. 06-10816, 2008 WL 5429667, at *2–3 (Bankr. M.D.N.C. Dec. 29, 2008), further explained the priority claim provided by § 507(a)(7), which allows a seventh priority status to "allowed unsecured claims of individuals, to the extent of $[3,800] for each such individual, arising from the deposit, before the commencement of the case, of money in connection with purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided." 11 U.S.C. § 507(a)(7).

> A deposit is "the act of giving money or property to another who promises to preserve it or to use it and return it in kind." *Blacks's Law Dictionary* (8th ed. 2004). Section 507(a)(7) allows priority status for "persons who made deposits for goods or services to be provided to them by the debtor for essentially consumer goods or services, when those goods or services were not provided by the debtor." *In re Globe Bldg. Materials, Inc.,* 345 B.R. 619, 628 (Bankr. N.D. Ind. 2006).

*Util. Craft, Inc.*, 2008 WL 5429667, at *2–3. Here, the funds in question were deposits for goods that ultimately were not provided by AG Design.

To be clear, the court does not condone the failure of AG Design to ensure sufficient funds were in its account to pay for the items ordered by the Baileys. However, this matter ultimately is a contract dispute. AG Design was contractually obligated to order the furniture for which the

Baileys paid, it breached that contract, and the Baileys were damaged by that breach.[10] To the extent the shareholders of AG Design may be responsible for the corporate debts, Mr. Tedeschi might have been liable for that breach of contract, but a breach of contract is not fraud. The debt at issue, therefore, is dischargeable.

## CONCLUSION

Based on the court's findings of fact, the court concludes as a matter of law that the debt owed to the Baileys by Mr. Tedeschi, as asserted in their proof of claim in the amount of $171,000, was not obtained through fraudulent misrepresentation or actual fraud and therefore is not excepted from discharge pursuant to 11 U.S.C. 523(a)(2)(A). The court further finds that, in the absence of fraud, there is no claim asserted in this adversary proceeding that would establish personal liability of Mr. Tedeschi for a contractual obligation of AG Design. Because there was no distribution to creditors in the underlying chapter 7 case, the court need not allow or disallow the contract claim as part of this adversary proceeding. A separate judgment will be entered consistent with this opinion.

**END OF DOCUMENT**

[10] Similarly, any credits or offsets would be owed to AG Design, not Mr. Tedeschi individually. Accordingly, the court need not find whether the Baileys would be contractually obligated for any of the asserted design fees or mileage asserted on the final invoice, and addressed those matters only to explain why the court does not believe that invoice was created in furtherance of a fraudulent scheme.